**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee*,

v.

RICHARD CARL BROWN,
       *Defendant-Appellant*.

No. 13-10354

D.C. No.
2:12-cr-00097-
RCJ-VCF-1

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted
September 9, 2014—San Francisco, California

Filed May 13, 2015

Before: Stephen Reinhardt, Ronald M. Gould,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

# SUMMARY[*]

## Criminal Law

The panel vacated convictions for advertising, transporting, receiving, and possessing child pornography, and remanded for a new trial, in a case in which the district court denied the defendant's motion to discharge his retained counsel.

The panel reiterated the intertwined rules of *United States v. Rivera-Corona*, 618 F.3d 976 (9th Cir. 2010): (1) A defendant enjoys a constitutional right to discharge his retained counsel for any reason "unless a contrary result is compelled by the 'purposes inherent in the fair, efficient and orderly administration of justice,'" and (2) if the court allows a defendant to discharge his retained counsel, and the defendant is financially qualified, the court must appoint new counsel for him under the Criminal Justice Act.

The panel held that the district court abused its discretion in denying the defendant's motion to discharge retained counsel and in refusing to appoint new counsel, where neither the reasons the district court offered after its own detailed inquiry, the additional reasons the government has suggested in its briefing, nor any reason the panel could infer from the record, provide any ground necessary to the fair, efficient, and orderly administration of justice to justify the denial of the defendant's motion to discharge retained counsel. The panel therefore vacated the convictions.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel rejected the defendant's arguments that the evidence presented at trial was insufficient to support his transportation and advertising convictions, and therefore remanded for a new trial. The panel held that a conviction for transportation or advertising of child pornography does not require evidence that the material actually crossed state lines. The panel also held that a reasonable jury could conclude that the actions taken by the defendant, the proprietor of a computer business with substantial technical computer knowledge – designating a non-default folder on his external hard drive to be shared by a peer-to-peer file-sharing program – are not materially different from those of a bulletin board operator, which *United States v. Mohrbacher*, 182 F.3d 1041 (9th Cir. 1999), suggested could be charged with transportation.

**COUNSEL**

Jason F. Carr, Assistant Federal Public Defender, Federal Public Defender's Office, Las Vegas, Nevada, for Defendant-Appellant.

William Ramsey Reed (argued) and Elizabeth Olson White, Assistant United States Attorneys, United States Attorney's Office, Reno, Nevada, for Plaintiff-Appellee.

**OPINION**

BERZON, Circuit Judge:

*United States v. Rivera-Corona*, 618 F.3d 976 (9th Cir. 2010), held that an indigent criminal defendant need not establish a conflict with his attorney amounting to the constructive denial of counsel as a prerequisite to substituting appointed counsel for his retained attorney. The district court in this case, like the parties, appears to have been unaware of *Rivera-Corona*, and instead applied the conflict requirement applicable to substitutions of appointed counsel for appointed counsel. We now reiterate *Rivera-Corona*'s intertwined rules: (1) A defendant enjoys a right to discharge his retained counsel for any reason "unless a contrary result is compelled by 'purposes inherent in the fair, efficient and orderly administration of justice,'" *Rivera-Corona*, 618 F.3d at 979 (quoting *United States v. Ensign*, 491 F.3d 1109, 1115 (9th Cir. 2007)), and (2) if the court allows a defendant to discharge his retained counsel, and the defendant is financially qualified, the court must appoint new counsel for him under the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A. Because no sufficient reason justified the district court's denial of Richard Carl Brown's right to discharge his retained lawyer or its refusal to appoint counsel, we vacate Brown's convictions and remand for a new trial. We also reject Brown's arguments that the evidence presented at trial was insufficient.

I.

Nevada police detectives identified a computer that had been sending and receiving child pornography through FrostWire, a peer-to-peer file-sharing program, as associated

with an internet protocol address registered to Brown. After the detectives downloaded from the computer a video containing child pornography, they obtained a search warrant for Brown's home. Brown shared his home with two roommates and ran a computer business from it. The search yielded a computer in Brown's bedroom, which forensic investigation indicated was the source of the video. Also found during the search were a disconnected external hard drive containing: various photos of Brown, including intimate photos; personal documents, such as Brown's father's death certificate; a folder designated to be shared by FrostWire; and hidden folders containing some 900 child pornography files. Brown was charged with one count each of advertising child pornography, 18 U.S.C. § 2251(d)(1)(A); transporting child pornography, 18 U.S.C. § 2252A(a)(1); receiving child pornography, 18 U.S.C. § 2252A(a)(2); and possessing child pornography, 18 U.S.C. § 2252A(a)(5)(B).

Two and a half weeks before trial was to begin, Brown's retained counsel filed a motion to withdraw from the case and substitute a public defender. Brown's attorney cited "strained" communications and an "actual conflict of interest" with Brown. He advised the court that Brown "desires counsel to withdraw from representing him," and attached an email in which Brown requested the withdrawal and indicated he would seek appointed counsel. A week later, counsel filed a motion to continue the trial regardless of the court's ruling on the motion to withdraw and substitute.

The district court held a hearing on the motion to withdraw. Brown's counsel began by informing the court of the "extreme divergence of philosophical opinion as to how the case should be carried on" between himself and Brown. The court responded, "Actually, is it more based in failure for

him to be able to pay your fee?"  The court emphasized that counsel could not withdraw for failure to pay fees without leave of court, and then continued:

> Now, here we are, of course, on the eve of trial.  Trial has been scheduled.  And just because your client is disagreeing with you on recommendations regarding plea or trial, that is not the basis to permit withdrawal.

Counsel assured the court that Brown's financial situation "really has nothing to do with this," but that the problem was "trust."

The court then ordered the hearing continued *ex parte* because privileged information would be discussed.[1]  At that point, counsel for the government, initially present, was excluded.  Before leaving the room, counsel indicated that the government had no position on the motion to withdraw but was opposed to a continuance.  An attorney from the Federal Public Defender's Office, initially present as well, remained in the courtroom during the *ex parte* portion of the hearing.

After counsel for the government left, the court inquired whether Brown had any "objection to the motion to withdraw."  Brown responded that he did not.  The court laid out the "problem," as it saw it, to Brown's attorney:

> You know, this is scheduled for trial. Obviously if I allow you to withdraw and

---

[1] The transcript of the *ex parte* portion of the hearing was filed under seal in the district court but included in Brown's unsealed excerpts of record before this court.  We therefore order the transcript unsealed.

appoint now – because he would qualify, I assume, for a public defender [–] and appoint a public defender, that will mandate a continuance of the trial so that person could be brought up to speed.

So I find great fault with your late filing of this motion, on the eve of trial, and what appears to be simply because there's a disagreement over payment and your inability, or unwillingness, to prepare for trial.

Your client has the right to insist upon trial as opposed to plea. That's the problem. So you've got to overcome those concerns in your argument.

Brown's counsel responded that he understood, that the dispute was not about money, and that he was prepared to proceed to trial. However, he again informed the court that "Mr. Brown has indicated to me that he would like us to withdraw."

The court then engaged Brown in the following colloquy:

THE COURT: . . . What is the disagreement, sir, that causes you to want a different attorney?

THE DEFENDANT: Your Honor, there's been – I guess we see things differently. . . .

THE COURT: Sure. What do you see differently?

THE DEFENDANT: I have tried on many occasions to talk to them about my defense, and they have never talked about a defense. They have always said hold on, this is how it works, just keep waiting, keep waiting, keep waiting –

THE COURT: You're talking about anticipating a potential plea?

THE DEFENDANT: Always. It was always about a plea. Ever since we met.

THE COURT: . . . What do you see differently from your attorney?

THE DEFENDANT: . . . [W]e never really discussed anything about a defense. They didn't want to hear about why I was not guilty.  They didn't want to hear about this.

I had witnesses and everything. We never talked about that. The first time I was asked about a list was after the first time I saw a plea, which is in the beginning of –

THE COURT: So what I hear you saying, sir, is you don't feel they were diligent in presenting defenses you wanted them to present?

THE DEFENDANT: Not at all . . .

The court told Brown that his attorney was very experienced, and that, within the limits of his ethical duties, his counsel was required to present the case, including any defenses, as Brown wished. Having sought to dispose of Brown's basis for dissatisfaction, the court indicated that it did not "understand yet, other than a feeling that he has not diligently pursued the defense, . . . any basis for a disagreement on the defense."

The discussion then turned to the topic of payment. Brown told the court that his attorney had not contacted him at all for the "first five or six months," and in general only "rarely contacted [him] except for payments." Brown said that he had "trouble getting the last payment" as he was "completely out of money." The court inquired how much the attorney had charged and how much Brown had paid. Brown responded, "$50,000," pursuant to a payment plan, and that "we're a little late on the last . . . payment." The court responded, "And you got it in." Brown did not directly respond, but explained that it was "really hard to even get that," and that his attorney had not asked for any more.

Then Brown returned to the focus of his dissatisfaction, his lawyer's handling of the case. He stated that he was "absolutely . . . not guilty" of the charges, and had witnesses to establish that the computer at issue was not his but, rather, belonged to a client of his business. He told the court, presumably also referring to his relationship with counsel, that additionally "[m]oney is an issue because it was always an issue up until this point."

Next, the district judge again addressed his attention to Brown's attorney. Emphasizing Brown's control of the defense, albeit constrained by counsel's ethical duties, the

judge asked "So, again, why should I release you?" The attorney cited a "breakdown in communication." When the attorney raised his concern about the prospect of "a 2255 somewhere down the road," presumably in reference to a potential ineffective assistance of counsel claim under 28 U.S.C. § 2255, the court responded, "You better not be, or I'll require you to refund the entire 50 grand." Counsel clarified that he was only emphasizing the level of "mistrust," and indicated that he could not "make [Brown] feel more comfortable with [the] representation."

At that point the court concluded the hearing, stating "I've got it. I'm denying the motion, sir." The court informed Brown that his attorney was "very reputable [and] qualified," that the case was prepared for trial, and, somewhat contradictorily, that the court would "give him whatever time he needs before we finally go to trial." But, the court went on, "he's been paid $50,000." And, the court assured Brown, he would not receive nearly as good a defense were the court to appoint a public defender. The court agreed, however, to "honor any appropriate request for a continuance." Trial was continued for nearly a month. Brown was convicted on all counts.

After the conviction, Brown filed a motion for judgment of acquittal or for a new trial, based in part on the court's denial of his attorney's motion to withdraw. The court denied the motion "mainly for the reasons set forth in the government's opposing brief," summarily concluding that there was no error and no prejudice. In actuality, the government, in its brief, did not address Brown's argument regarding the motion to withdraw, beyond noting that the government was "not a party" to the *ex parte* proceedings and

that, in its view, Brown's attorney did "an excellent job" at trial.

The district court sentenced Brown to concurrent 180-month sentences on each of the advertising, transportation, and receipt counts, and a concurrent 180-month suspended sentence for the possession count. This appeal followed.

II.

As *Rivera-Corona* explained, "The Sixth Amendment's right to counsel encompasses two distinct rights: a right to adequate representation and a right to choose one's own counsel." 618 F.3d at 979 (quoting *Daniels v. Lafler*, 501 F.3d 735, 738 (6th Cir. 2007)) (internal quotation marks omitted). At the outset, this case, like *Rivera-Corona*, involves the latter right.

When the court has appointed an attorney for an indigent defendant, the defendant, like all criminal defendants, has "a constitutional right to *effective* counsel." *Rivera-Corona*, 618 F.3d at 979 (emphasis added). But he does not have the right to the counsel of his choice; that is, "to have a specific lawyer appointed by the court and paid for by the public." *Id*. Thus, when an indigent defendant represented by appointed counsel asks the court to discharge that lawyer and appoint a different one, the governing question is whether the conflict between client and counsel is so extreme as to constitute a "constructive denial of counsel" altogether. *Id*. (quoting *Daniels v. Woodford*, 428 F.3d 1181, 1198 (9th Cir. 2005)) (internal quotation marks omitted). To determine if the conflict is severe enough to warrant substitution under those circumstances, "we consider (1) the timeliness of the substitution motion and the extent of resulting inconvenience

or delay; (2) the adequacy of the district court's inquiry into the defendant's complaint; and (3) whether the conflict between the defendant and his attorney was so great that it prevented an adequate defense." *Id*. at 978 (citing *United States v. Mendez-Sanchez*, 563 F.3d 935, 942 (9th Cir. 2009)).

By contrast, a defendant who has hired his own attorney "has a different right, independent and distinct from the right to effective counsel, to be represented by the attorney *of his choice*." *Id*. at 979 (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006)). This "right to select counsel of one's choice" is "the root meaning of the constitutional guarantee" found in the Sixth Amendment. *Gonzalez-Lopez*, 548 U.S. at 147-48. Accordingly, the denial of this right does not depend on "the quality of the representation . . . received." *Id*. at 148. While the right to counsel of one's choice is not absolute, "[i]n general, a defendant who can afford to hire counsel may have the counsel of his choice unless a contrary result is compelled by 'purposes inherent in the fair, efficient and orderly administration of justice.'" *Rivera-Corona*, 618 F.3d at 979 (quoting *Ensign*, 491 F.3d at 1115)).

*Rivera-Corona* addressed "the standards applicable in the situation in which a district court considers a defendant's motion to discharge his retained counsel and be represented by a court-appointed attorney." 618 F.3d at 979. We held that, as a defendant's request to substitute appointed counsel in place of a retained attorney "implicate[s] the qualified right to choice of counsel," "the extent-of-conflict review is inappropriate." *Id*. at 981.

We note that it is not, strictly speaking, correct to say that the defendant in *Rivera-Corona*, or the defendant in this case, was entitled to, or seeking, *counsel of choice*. Had either defendant's motion been granted, he would have been entitled to *some* appointed counsel, not an appointed lawyer of his choosing. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). Rather, in the context of *Rivera-Corona* and of this case, the Sixth Amendment right to counsel of choice means that a defendant has a right to "*fire* his retained . . . lawyer . . . for any reason or [for] no reason." *Rivera-Corona*, 618 F.3d at 980 (emphasis added). One constitutional right at issue in this context is, thus, a right to discharge retained counsel.

The government contends in its supplemental briefing – having previously overlooked *Rivera-Corona* – that *Rivera-Corona* does not govern this case. The attorney in *Rivera-Corona*, notes the government, had demanded an additional $5,000 in legal fees. *Rivera-Corona*, 618 F.3d at 978; *see also id.* at 982. In this case, by contrast, Brown apparently paid the full retainer amount, and there was no additional fee due.**[2]**

*Rivera-Corona*'s constitutional holding, however, was not limited to circumstances in which retained counsel demands additional fees. Instead, it considered, *in general*, "the standard for considering a criminal defendant's motion to discharge his privately retained counsel and to proceed with

---

**[2]** The district court appears to have found that Brown paid the full retainer. Although the record does not reflect that Brown ever clearly stated as much, Brown does not challenge that conclusion, and it is not clearly erroneous. *See United States v. Adelzo-Gonzalez*, 268 F.3d 772, 777 (9th Cir. 2001).

a different, court-appointed lawyer instead," *id*. at 977, and concluded that, under those circumstances, the defendant enjoys a Sixth Amendment right to discharge his retained counsel, *id*. at 981. That constitutional holding applies to this case as well.

### III.

Again like *Rivera-Corona*, this case implicates not only the constitutional right to discharge retained counsel but also the statutory right to appointment of counsel in his stead. When a court denies a motion to substitute appointed for retained counsel, as the district court did in this case, it is really deciding two issues. The first, whether the defendant may *discharge* the attorney whom he retained, implicates the Sixth Amendment right to counsel of choice, as discussed above. But the court ruling on such a motion is, at the same time, also considering a request for *appointment* of counsel. And, while a criminal defendant's right to appointed counsel of course does have a constitutional aspect, *see Gideon v. Wainwright*, 372 U.S. 335 (1963), in federal court the question whether counsel should be appointed is governed, first and foremost, by the CJA, 18 U.S.C. § 3006A. Of course, as a practical matter the two issues – discharge of retained counsel and appointment of CJA counsel – are intertwined, and the decisions as to them will ordinarily be considered and announced together. However, the sequence and manner in which the two issues are addressed may not leave the defendant without any counsel at all, absent a voluntary, knowing, and intelligent decision to proceed *pro se*. *See Faretta v. California*, 422 U.S. 806, 835 (1975); *United States v. Gerritsen*, 571 F.3d 1001, 1007 (9th Cir. 2009). The difficult issue, in an intertwined case of this nature, occurs with respect to the first issue, the constitutional

issue, whether the defendant may discharge retained counsel. If the answer is yes, the CJA provides that counsel shall be appointed for the indigent defendant unless he wishes to assert his *Faretta* rights.

In general, section 3006A(b) provides that, "[i]n *every case* in which a person entitled to representation . . . appears without counsel . . . the court, if satisfied after appropriate inquiry that the person is financially unable to obtain counsel, shall appoint counsel to represent him," unless the right is waived. 18 U.S.C. § 3006A(b) (emphasis added). An indigent defendant who exercises his constitutional right to discharge retained counsel is "without counsel," so § 3006A(b) applies.[3] Accordingly, the CJA requires the appointment of counsel under the circumstances of this case.

---

[3] We note that an indigent defendant who exercises his constitutional right to discharge his retained counsel, and so is left without an attorney, is thus very differently situated from an indigent defendant who can no longer pay his retained lawyer but may have no objection to that lawyer's continued representation, and indeed may welcome it. Some courts have pointed out that appointing a previously retained lawyer as CJA counsel in the latter circumstance is not warranted simply to "bail . . . out" retained counsel "who fails to make adequate arrangements before accepting representation of a client," *Haas*, 623 F.3d at 1221 (internal quotation marks omitted), and expressed concern that "a defendant with some means" could "in effect, select [his CJA] counsel," while an initially indigent defendant has no such opportunity. *United States v. Thompson*, 361 F. Supp. 879, 888 (D.D.C. 1973) (Bazelon, Ch. J., D.C. Cir.), *vacated in part on other grounds, affirmed in part without opinion*, 489 F.2d 1273 (D.C. Cir. 1974), *overruled in part on other grounds*, *United States v. Hunter*, 394 F. Supp. 997, 1001 (D.D.C. 1975) (Bazelon, Ch. J., D.C. Cir.). On the other hand, a district court might choose, despite these concerns, to appoint previously retained counsel, as doing so is likely to save the court time and money as compared to appointing new counsel. In any event, where, as here, the defendant is dissatisfied with his retained counsel and therefore discharges him, these concerns related to the appointment of the *same* previously retained lawyer are not implicated.

The government maintains that, in cases like this one, as in *Martel v. Clair*, the factors relevant to the appointment of counsel issue are "the timeliness of the motion; the adequacy of the district court's inquiry into the defendant's complaint; and the asserted cause for that complaint, including the extent of the conflict or breakdown in communication between lawyer and client (and the client's own responsibility, if any, for that conflict)." *Martel v. Clair*, 132 S. Ct. 1276, 1287 (2012).

The government's proposed standard for appointment of counsel once retained counsel is discharged is essentially identical to the extent-of-conflict analysis applicable to replacement of one appointed counsel by another. That is, the government would have us hold that, notwithstanding Brown's *constitutional* right to discharge his lawyer, the restrictive extent-of-conflict analysis governs whether a replacement is appointed. We disagree. The appropriate standard must reflect the Sixth Amendment right which governs a particular case. Where, as here, the right to retained counsel of choice is implicated, *Rivera-Corona* specifically held that "the extent-of-conflict review is inappropriate." *Rivera-Corona*, 618 F.3d at 981.

Nor does *Martel* support the government's position. It concerned the substitution of one appointed counsel for another, not the initial appointment of counsel for a financially qualified individual after retained counsel is discharged.

If anything, *Martel* points against the government's proposed standard. In *Martel*, the Supreme Court read an interests-of-justice standard into 18 U.S.C. § 3599, which provides for appointed counsel in capital habeas proceedings

but does not specify the standard applicable to requests for a new appointed attorney. 132 S. Ct. at 1283–84. The Court rejected California's argument that, because habeas petitioners have no Sixth Amendment right to counsel at all, a more restrictive standard for appointment of a replacement attorney is warranted in such cases than applies to defendants in federal criminal prosecutions. "A statute need not draw the same lines as the Constitution," the Court observed. *Id*. at 1286. And the Court held that in § 3599 Congress permissibly chose to provide *greater* access to counsel than the Sixth Amendment required. *Id*. In this case, by contrast, the government's statutory interpretation would, in effect, provide Brown with *less* access to counsel than that to which he is constitutionally entitled, by potentially *denying* him *any* counsel if he exercises his constitutional right to discharge retained counsel.

As we have seen, there *is* a statutory right to appointed counsel. Once a district court allows a financially qualified defendant to exercise his right to fire his retained lawyer, § 3006A(b) requires, absent a voluntary, knowing, and intelligent decision to proceed *pro se*, *see Faretta*, 422 U.S. at 835, that the court appoint a new attorney in his place.

We note that in *Rivera-Corona*, which was in many respects similar to the case before us, the dispute essentially revolved around the defendant's concern about financial relationships between himself and his counsel. He was concerned that his counsel would not perform properly because he was unable to afford to make the necessary payments. We treated this question as primarily covered by subsection (c), which relates in part to persons financially unable to pay retained counsel during the course of a case, rather than the more general subsection (b), which is

applicable here. *Rivera-Corona*'s controlling principles relate essentially to the constitutional question of how and when a defendant may *discharge* a retained attorney and substitute an appointed one. *Rivera-Corona*'s answer to that constitutional question was "for any reason," subject to only the orderly administration of justice qualification. Having applied *Rivera-Corona*'s constitutional rule in Brown's favor, our final step is to apply the appropriate statutory rule for the appointment of counsel to an indigent defendant, § 3006A(b).

## IV.

Applying *Rivera-Corona*'s principles to this case, we hold that the district court abused its discretion in denying Brown's motion to discharge retained counsel. The district court prevented Brown from discharging his retained lawyer and so refused to appoint counsel. As discussed above, each of those decisions was erroneous unless the denial of the motion to discharge retained counsel was "compelled by 'purposes inherent in the fair, efficient and orderly administration of justice.'" *Id*. Here, neither the reasons the district court offered after its own detailed inquiry, the additional reasons the government has suggested in its briefing, nor any reason we can infer from the record, provide any ground necessary to the fair, efficient, and orderly administration of justice to justify the denial of Brown's motion.

## A.

We note at the outset that the district court did not explicitly discuss *either* the constitutional right to retained counsel of choice *or* the extent-of-conflict analysis. Nor, indeed, did it ever discuss how, if at all, it believed Brown's

Sixth Amendment rights were implicated. But, to the extent that the court did implicitly consider a Sixth Amendment right, it focused on considerations pertinent to the right to constitutionally adequate counsel, rather than to the right to choice of counsel Brown actually enjoyed. Reflecting the district court's misunderstanding of the right at issue, the reasons the district court gave for denying the motion are inadequate to preclude the discharge of retained counsel and thus the *initial* appointment of counsel, the questions actually before it, and before this court.

To some extent, the district court's attention was focused on the *attorney's* reasons for moving to withdraw. From the outset, the court was concerned that counsel was seeking to withdraw from the case because Brown had not paid his legal fees, although eventually the court accepted that Brown had paid his fees in full. The court was, however, still very concerned about the prospect that Brown's attorney was proposing to walk away from the case after being paid $50,000; when counsel raised the possibility of an ineffective assistance of counsel claim, the court responded by threatening to order a refund of the entire retainer amount. Finally, the court reiterated several times that, within his ethical obligations, counsel was required to defer to Brown's wishes regarding the conduct of his case, and that disagreements on that issue would not be grounds to withdraw.

But this motion was not primarily about Brown's lawyer trying to withdraw from the case. Rather, *Brown* was trying to fire his lawyer. Brown and his attorney made that impetus for the motion abundantly clear in an email attached to the original motion to withdraw and in several statements each made during the hearing. That being the case, the district

court's primary responsibility was *not* to ensure a fair attorney-client relationship or to supervise the conduct of the lawyer. Those are relevant and important considerations when a court considers a lawyer's motion to withdraw. *See, e.g.*, *Brandon v. Blech*, 560 F.3d 536, 537–39 (6th Cir. 2009). But where, as here, it is apparent that the defendant, not the attorney, instigated the withdrawal motion, the defendant's Sixth Amendment rights should trump whatever concerns the court has about the lawyer's motives.

When the district court did turn its attention to the defendant's reasons for wishing to switch lawyers, it became clear that Brown's complaints were threefold. First and foremost, Brown was unsatisfied with his lawyer's conduct of the case. Underscoring his attorney's assessment of an "extreme divergence of philosophical opinion as to how the case should be carried on," and a great deal of "mistrust," Brown made it perfectly clear that he believed himself to be innocent of the charges, but that his attorney had "never talked about a defense" but "always about a plea . . . since [they] met." Second, Brown agreed with his counsel that he and his lawyer had been in infrequent contact, although each blamed the other for the lack of communication. Third, while Brown indicated that he had paid the entire $50,000 retainer, he implied that financial tensions had contributed to souring the relationship with his lawyer: He had "trouble getting the last payment," and money was "always an issue up until [that] point."

In the context of the constitutional right to discharge a retained lawyer, any of these concerns was more than sufficient. Brown's *reasons* for wanting to discharge his retained lawyer were not properly the court's concern at all. He had the right to "fire his retained . . . lawyer . . . *for any*

*reason or [for] no reason*.” *Rivera-Corona*, 618 F.3d at 980 (emphasis added). Only affirmative interference with the “fair, efficient and orderly administration of justice,” *id.* at 979 (internal quotation marks omitted), could have justified an order that Brown could *not* discharge his lawyer.

Yet, in rejecting the request despite Brown’s serious concerns about his attorney, the court cited only the qualifications of Brown’s current attorney; the supposedly inferior representation Brown would receive if the Federal Public Defender’s Office substituted into the case; the attorney’s ethical obligation to allow Brown to control the defense; the lawyer’s representation that he was prepared for trial, as well as the court’s offer of a continuance for “whatever time he need[ed]” to finish preparing; and the fact that the lawyer had already been paid $50,000. All of these reasons – except, perhaps, the last – bear on the district court’s perception that the retained attorney would provide an adequate defense and that Brown’s complaints did not establish a conflict sufficient to constitute a constructive denial of counsel, neither of which were, in themselves, pertinent considerations.[4]

Again, given Brown’s right to discharge his retained attorney if he chose to do so, it did not matter whether the court considered Brown’s current lawyer well qualified, or prepared for trial, or – most dubiously of all, given the very high quality of federal public defenders in general – better

---

[4] The fact that the lawyer had already been paid $50,000 was relevant only to the notion that allowing the lawyer to walk away from the case would be unfair *to Brown*. This concern, too, was not a pertinent consideration, as Brown, not the lawyer, was instigating the withdrawal.

than the alternative.[5]  *See Gonzalez-Lopez*, 548 U.S. at 148 (the right to counsel of choice is "the right to a particular lawyer *regardless of comparative effectiveness*" (emphasis added)).  All of the court's articulated reasons were, simply put, not relevant under these circumstances.

## B.

One possible reason for the district court's rulings warrants separate analysis.  The government suggests in its briefing that the district court denied Brown's motions because of the expectation of delay associated with allowing Brown to discharge his lawyer and obtain the appointment of new counsel.  This reason is best understood as addressing question one – whether the district court should permit a defendant to discharge retained counsel or whether "a contrary result is compelled by 'the purposes inherent in the fair, efficient and orderly administration of justice.'" *Rivera-Corona*, 618 F.3d at 979 (quoting *Ensing*, 491 F.3d at 1115).

---

[5] Indeed, we completely disagree with the district court's assessment of federal public defenders, who, in our experience, typically provide the highest quality representation, very often superior to that provided by members of the private criminal defense bar.  Nor are we alone in that opinion: A survey of 457 federal district and appellate judges, published as part of an article co-authored by Judge Posner of the Seventh Circuit, rated advocacy by public defenders in federal court significantly higher than that provided by privately retained attorneys, court-appointed attorneys, and even prosecutors.  Richard A. Posner & Albert H. Yoon, *What Judges Think of the Quality of Legal Representation*, 63 Stan. L. Rev. 317, 322, 327 (2011); *see also id*. at 341-42 (reviewing research suggesting that "a majority of indigent federal criminal defendants may be serving longer sentences by virtue of not having been represented by a federal public defender").

The district court in this case did initially express concern with the timing of the request, which was filed two and a half weeks before trial was originally set to begin. And the district court has "wide latitude in balancing the right" to discharge retained counsel against "the demands of its calendar." *Gonzalez-Lopez*, 548 U.S. at 152. We conclude, however, that the district court in this case did not, in fact, deny the motion *because of* "the demands of its calendar," *id.*, nor, on this record, would that concern suffice as an administration-of-justice basis for denial of the constitutional right to discharge retained counsel.

First, the court never said that concern for its calendar was its reason for denying the motion. Rather, the court cited various factors that related principally to its perception that Brown's lawyer would provide effective assistance of counsel. The court did *not* cite possible delay when it ruled on the motion.

Second, the court's willingness to continue the case belies the suggestion that it denied the motion to avoid delay. The court repeatedly offered to continue the case, indicating, at one point, that it would allow Brown's lawyer "whatever time he need[ed] before we finally go to trial." And, in fact, the trial *was* continued, by a month, after the hearing, and so took place some six and a half weeks after the motion to substitute was filed.

Third, the court made no effort to ascertain how long the newly appointed attorney would likely need to prepare for trial. The court stated that such an appointment would require a "continuance of the trial so that person could be brought up to speed." But, even though an attorney from the Federal Public Defender's Office was present throughout the

hearing, indicating that the office was acquainted with the circumstances and was willing to take over the case immediately, the court never asked how long a continuance would be necessary should it do so.

In light of these circumstances, we cannot conclude that the district court denied Brown's request to discharge his retained counsel because of concern for its calendar, or that the federal public defender would have needed any more time than retained counsel requested and was granted. Indeed, it appears that the retained attorney had concentrated theretofore on trying to obtain a plea bargain, and, in fact, shortly before the hearing on the motion to withdraw, filed a motion to continue the trial *regardless* of the outcome of the hearing, citing the need to repair his relationship with Brown, investigate, research, and prepare for trial.

Aside from timing, the government suggests no reason why the "purposes inherent in the fair, efficient and orderly administration of justice," *Rivera-Corona*, 618 F.3d at 979 (quoting *Ensign*, 491 F.3d at 1115) (internal quotation marks omitted), could justify the district court's ruling, nor, having independently reviewed the entire record, can we conceive of any.

The district court fully explored all the possible reasons for granting or denying Brown's motion and set forth those it considered relevant. Despite its extensive inquiry, at no point did it indicate that granting the motion would pose any impediment to the "fair, efficient and orderly administration of justice," *id.* (internal quotation marks omitted), which surely it would have had it concluded that such an impediment supported the denial of Brown's motion. Having carefully reviewed the record in light of the constitutional and

statutory requirements, we conclude that no such reason exists, and so Brown's motion to discharge his retained lawyer should have been granted.  As Brown met the financial requirements for an appointed lawyer, he was entitled to one – such as the federal public defender waiting in the courtroom.

## V.

We turn to the question of remedy.  The denial of a defendant's right to counsel of choice is a structural error, requiring that convictions be vacated even without a showing of prejudice.  *Gonzalez-Lopez*, 548 U.S. at 150. Accordingly, because Brown's motion to substitute counsel should have been granted, Brown was denied his right to counsel of choice and we must vacate his convictions.[6]

---

[6] The remedy we adopt (vacating Brown's convictions) is not inconsistent with *Martel*, 132 S. Ct. at 1289 n.4.  The alleged abuse of discretion considered in *Martel*'s footnote 4 was a purely procedural one: According to this court, the district court in *Martel* had erred in "denying Clair's substitution motion *without inquiry*."  *Id*. (emphasis added).  In this case, in contrast, the district court's error was substantive: Unlike the standards applicable to replacing appointed counsel, at issue in *Martel*, the standards applicable to denial of the constitutional right to counsel of choice centrally at issue here allows the district court only limited discretion to deny the defendant's choice when required by the "fair, efficient and orderly administration of justice." *Rivera-Corona*, 618 F.3d at 979 (internal quotation marks omitted); *see also Cassel*, 408 F.3d at 637 ("The trial court's discretion must be exercised . . . within the limitations of the Sixth Amendment . . . .") (internal quotation marks omitted).  Under the correct standard, there was no adequate reason to deny Brown's motion, and so it should have been granted.

VI.

We next consider Brown's arguments that the evidence at trial was insufficient to establish guilt, as those arguments, if correct, would foreclose retrial. *See McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (citing *Burks v. United States*, 437 U.S. 1, 18 (1978)); *United States v. Rylander*, 714 F.2d 996, 1001, 1003, 1004–05 (9th Cir. 1983). We review sufficiency of the evidence de novo, determining whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Fasthorse*, 639 F.3d 1182, 1183-84 (9th Cir. 2011) (quoting *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc)) (emphasis and internal quotation marks omitted).

Brown argues, first, that the transportation and advertising convictions required evidence that "the material itself . . . cross[ed] state lines." *United States v. Wright*, 625 F.3d 583, 594 (9th Cir. 2010). *Wright* was specifically predicated, however, on the wording of § 2252A(a)(1) "[a]s it existed at the time of Wright's offense in 2003." *Id.* at 590. At that time, the statute criminalized transportation "in interstate . . . commerce." *Id*. (internal quotation marks omitted). As *Wright* noted, the statute was amended in 2008, and now bars transportation "using any means or facility of interstate . . . commerce or in or affecting interstate . . . commerce." 18 U.S.C. § 2252A(a)(1); *see also Wright*, 625 F.3d at 599–600. The advertising statute was also amended to include essentially identical language. *See* 18 U.S.C. § 2251(d)(2)(A)–(B); Pub.L. No. 110–358, 122 Stat. 4001.

This amendment "effected a substantial change": While the former wording was selected "to afford the statute a more limited jurisdictional reach," in 2008 "Congress chose to regulate to the outer limits of its Commerce Clause authority by inserting the 'affecting interstate commerce' language." *Wright*, 625 F.3d at 600; *see also United States v. Walls*, No. 13-30223, 2015 WL 1783041, at *2–3 (9th Cir. Apr. 21, 2015). Congress has the constitutional authority to "criminalize [the] intrastate possession" of child pornography. *United States v. Sullivan*, 753 F.3d 845, 854 (9th Cir. 2014) (citing *United States v. Gallenardo*, 579 F.3d 1076, 1081 (9th Cir. 2009)); *see also* 18 U.S.C. § 2252A(a)(5)(B). We see no reason why it would have less authority to criminalize intrastate transportation and advertising of such materials. Accordingly, we hold that a conviction for transportation or advertising of child pornography does not require evidence that the material actually crossed state lines.

Second, Brown asserts that the government's theory of the case, namely that "by knowingly allowing files to remain in FrostWire's shared folder, Brown 'transported' the files," does not in fact establish a violation of 18 U.S.C. § 2252A(a)(1). Brown's argument is not without persuasive force. If, for example, the owner of an apple tree hangs a sign inviting passersby to help themselves, he has surely possessed and advertised the apples, and, if someone picks one, can fairly be said to have distributed it by making it freely available. *See United States v. Budziak*, 697 F.3d 1105, 1109 (9th Cir. 2012). But has he "transported" the apples?

The slate on this issue is not blank. In *United States v. Mohrbacher*, 182 F.3d 1041 (9th Cir. 1999), the defendant was charged with the closely related crime of transporting

visual depictions of minors engaged in sexually explicit conduct, 18 U.S.C. § 2252(a)(1), for having "download[ed] images of child pornography from [an] . . . electronic bulletin board." 182 F.3d at 1043. The electronic bulletin board was an automated system that allowed users to select and download images. *Id*. at 1045. *Mohrbacher* held that the defendant in that case could not be convicted of transportation, as "[a]n individual who downloads images from a computer bulletin board takes an action that is more analogous to ordering materials over the phone and receiving materials through the mail than to sending or shipping such materials." *Id*. at 1050.

*Mohrbacher* contrasted the defendant's role in that case to that of the operators of the bulletin board: Despite the automated nature of the system, "[t]hose who are responsible for providing the images to a customer, by making them available on a computer bulletin board . . . , are properly charged with and convicted of shipping or transporting images under § 2252(a)(1)." *Id*. (emphasis omitted). The point was further underscored in a footnote: It was "difficult to claim that Mohrbacher himself *caused* the images to be transported when one considers that the bulletin board operator is in reality the individual who is primarily responsible for the images moving from the bulletin board to individuals' computers." *Id*. at 1049 n.9. Thus, contrary to the government's position in that case, the court indicated that "[t]he action of the bulletin board operator," rather than Mohrbacher's, could be prosecuted as an instance of "transporting." *Id*.

To be sure, *Mohrbacher* involved a slightly different statute. Further, the defendant in *Mohrbacher* was analogous not to Brown but to individuals who downloaded child

pornography from Brown's computer. The criminal liability of the uncharged operator, which *Mohrbacher* suggested could be charged with transportation, was not directly at issue in *Mohrbacher*. Nonetheless, *Mohrbacher*'s holding, that Mohrbacher was *not* guilty of transportation, stood squarely on the understanding that the bulletin board operator was guilty of that crime. Thus, to the extent Brown's role is materially the same as that of the bulletin board operator, *Mohrbacher* forecloses his argument.

To resolve this case, however, we need not decide whether *any* user of a peer-to-peer service who makes his files available for other users to download is categorically equivalent to the operator of the bulletin board discussed in *Mohrbacher*. The evidence at trial showed that Brown, the proprietor of a computer business with substantial technical computer knowledge, had designated a non-default folder on his external hard drive to be shared by FrostWire. In light of this evidence, a reasonable jury could conclude that the actions Brown took are not materially different from those the operator took in setting up the bulletin board system in *Mohrbacher*. The evidence was therefore sufficient as to the transportation charge.[7]

---

[7] In light of our decision to vacate Brown's convictions, we do not reach his other arguments. We note that the government conceded on appeal that Brown's conviction for possession of child pornography is a lesser included offense of his conviction for receipt of child pornography. If, on retrial, Brown is again convicted of both offenses, the district court should vacate one of the convictions, rather than suspending one of the sentences. *See United States v. Brobst*, 558 F.3d 982, 1000 (9th Cir. 2009).

VII.

Because Brown was denied his constitutional right to discharge his retained lawyer and his statutory right to have counsel appointed in that lawyer's place, we vacate Brown's convictions and remand for a new trial.

**VACATED AND REMANDED.**